**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| MICHAEL F., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      1:25CV42 |
| | ) |
| FRANK J. BISIGNANO, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant.[1] | ) |

**MEMORANDUM OPINION AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Michael F., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 5 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 11 (Plaintiff's Brief); Docket Entry 13 (Commissioner's Brief); see

---

[1] The United States Senate confirmed Frank J. Bisignano as the Commissioner of the Social Security Administration on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should substitute for Carolyn W. Colvin as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

<u>also</u> Docket Entry 14 (Plaintiff's Reply)).  For the reasons that follow, the Court will enter judgment for the Commissioner.[2]

**I.  PROCEDURAL HISTORY**

Plaintiff applied for SSI on September 1, 2020 (Tr. 208-14), alleging a disability onset date of July 1, 2019 (<u>see</u> Tr. 208).[3] Upon denial of that application initially (Tr. 101-09, 139-43) and on reconsideration (Tr. 110-20, 145-47), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 148).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 53-100.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 28-52.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 15-20, 200-02, 340-42), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1.   [Plaintiff] has not engaged in substantial gainful activity since September 1, 2020, the application date.
>
> . . .

---

[2]   On consent of the parties, "this case [wa]s referred to the [undersigned] United States Magistrate Judge . . . to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings []herein."  (Docket Entry 9 at 1.)

[3] Notwithstanding Plaintiff's alleged onset date of July 1, 2019, she lacked eligibility for SSI benefits until her application date of September 1, 2020 (<u>see</u> Tr. 208).  <u>See</u> 20 C.F.R. § 416.202 (explaining that a claimant remains ineligible for SSI benefits until date he or she files SSI application); 20 C.F.R. § 416.501 (stating that a claimant may not receive SSI benefits for any period that predates first month he or she satisfies eligibility requirements, which cannot precede application date).

2

2.   [Plaintiff] has the following severe impairments: depression; dissociative identity disorder; gender dysphoria disorder; post-traumatic stress disorder; and attention deficit hyperactivity disorder.

. . .

3.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

4.   . . . [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [she] is limited to understanding, remembering, and carrying out simple instructions, can use judgment to make simple work-related decisions; and can sustain concentration, attention, and pace sufficient to carry out those simple instructions for two-hour intervals over the course of an eight-hour work day; is limited to jobs in which she could work in proximity to, but not coordination with, co-workers and supervisors, and can have only superficial contact with the public, where "superficial" is defined to mean the contact is incidental and not an essential function of the job. However, she would be able to interact with others sufficiently to complete a 30-day training period for such an occupation.  She is limited to work in a low stress setting, which is defined to mean work involving: no paced production requirements, such as on an assembly line, where the worker does not control the pace of production, occasional changes in the work setting or routine, and no dealing with crisis situations as an essential function of the job.

. . .

5.   [Plaintiff] has no past relevant work.

. . .

9.   Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

3

. . .

10. [Plaintiff] has not been under a disability, as defined in the [] Act, since September 1, 2020, the date the application was filed.

(Tr. 34-46 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla

4

of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[4] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174

---

[4] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

F.3d 473, 475 n.2 (4th Cir. 1999).[5] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[6] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the

---

[5] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[6] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65.  If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[7]

## B.  Assignment of Error

In Plaintiff's first and only issue on review, she asserts that "[t]he [ALJ] erred as a matter of law by failing to build a logical bridge between the medical evidence of record and the RFC determination that Plaintiff could tolerate increased social contact during a training period compared to during a post-training period."  (Docket Entry 11 at 6 (all-caps font and block formatting omitted); see also Docket Entry 14 at 1-10.)  More specifically, Plaintiff maintains that, "[t]hrough the RFC, the ALJ expressly f[ound] that Plaintiff could tolerate only superficial contact with

---

[7]  A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

coworkers and supervisors and should be limited to working 'in proximity to, but not coordination with' coworkers and supervisors," but also found that Plaintiff "'*would be able to interact with others sufficiently to complete a 30-day training period.*'" (Docket Entry 11 at 8 (quoting Tr. 38) (emphasis in original).) According to Plaintiff, "[t]he RFC, and the entirety of the [ALJ's] decision, is silent as to what level of interaction [] Plaintiff might engage in with coworkers and supervisors during her probationary period[,] . . . thereby leaving the Court to perform guesswork in figuring out what the ALJ intended." (Id.) Plaintiff additionally argues that "the ALJ's decision provides an insufficient rationale for creating this training period exception" (id. at 9) by relying on the fact that "'[Plaintiff] has, in fact, worked longer than 30 days in occupations requiring more extensive social interaction'" (id. (quoting Tr. 41)). Plaintiff further notes that none of the medical opinions of record "endorses or suggests that Plaintiff's limitations relating to social contact would be less pronounced during a given period of employment." (Id. at 10 (citing Tr. 105, 107, 114, 118, 627, 651).)

In Plaintiff's view, the ALJ's above-described error "is not harmless," because "[t]he training period carveout significantly expands the occupational base by allowing for augmented social interaction at a stage of employment that, under [SSA] rulings and vocational understanding, is considered essential to establishing

9

job retention and successful performance." (Id. at 12; see also id. at 13 (quoting Sczepanski v. Saul, 946 F.3d 152, 157 (2d Cir. 2020), for proposition that "[t]he ability to complete a probationary period is tantamount to the ability to keep a job, and . . . the ability to keep a job is a necessary prerequisite to the ability to engage in substantial gainful activity").) Plaintiff further contends that, "[h]ad the VE been instructed to assume consistent social limitations throughout the employment period, including training, the job numbers may have materially changed, or no jobs might have been identified." (Id.)

Here, the ALJ found at steps two and three of the SEP that Plaintiff's mental impairments caused her to experience moderate limitation in her ability to interact with others (see Tr. 36-37), reasoning as follows:

> In interacting with others, [Plaintiff] has a moderate limitation. [She] has undergone periods of significant depressive symptoms including two inpatient hospitalizations for suicidal ideations shortly prior to her protected filing date. More recent treatment notes document significant improvement in symptoms. [Consultative psychological examiner Ashley] Phelps[, M.A., L.P.A., ("LPA Phelps")] opined that [Plaintiff] may have mild difficulty interacting appropriately with peers and coworkers and responding appropriately to supervision, based on her work history. [Consultative psychological examiner Alexandria Little] Westfall[, M.A., L.P.A., ("LPA Westfall")] opined that [Plaintiff] would also likely have significant difficulties interacting with peers and coworkers and responding appropriately to supervision. Both [state

10

agency psychological consultants] determined [Plaintiff] had moderate limitations in this domain.

(Tr. 37.)  In turn, the ALJ determined that Plaintiff's moderate difficulties in interacting with others resulted in RFC limitations to "jobs in which [Plaintiff] could work in proximity to, but not coordination with, co-workers and supervisors, [with] only superficial contact with the public, where 'superficial' is defined to mean the contact is incidental and not an essential function of the job" (Tr. 38), but also found that Plaintiff "would be able to interact with others  sufficiently to complete a 30-day training period for such an occupation" (id. (emphasis added)).

The ALJ thereafter provided the following explanation for those limitations:

> Given the evidence of some interpersonal difficulties, the [ALJ] finds [Plaintiff] would be limited to jobs in which she could work in proximity to, but not coordination with, co-workers and supervisors, and can have only superficial contact with the public, where "superficial" is defined to mean the contact is incidental and not an essential function of the job.  The [ALJ] finds it appropriate to limit the type of interaction with co-workers and supervisors, as opposed to the frequently [sic] of such interaction.  However, the evidence does not show that [Plaintiff]'s social limitations would be so severe as to prevent her from engaging in the necessary level of interaction required to complete a 30-day training period for such an occupation.  It should be noted that [Plaintiff] has, in fact, worked longer than 30 days in occupations requiring more extensive social interaction. . . . .
>
> Although [Plaintiff] has alleged greater limitations, those allegations are not consistent with the treatment records since the current application date, which reflect symptoms that have been fairly well managed with limited, conservative treatment.  As well, the allegations are not

11

consistent with [Plaintiff]'s ability to work at least part-time in jobs. <u>Although [she] has reported some difficulties in keeping some of those jobs, it is notable that the jobs have mostly been significantly more mentally demanding than the limitations set forth [in the RFC]</u>. Further, [t]he [ALJ] notes that while [Plaintiff] reported having been fired from several jobs due to interpersonal conflict ([Tr. 229-38, 338-39]), <u>all but two of those positions predated the alleged onset date</u>. That [Plaintiff] reportedly lost her customer service job at Home Depot due to interpersonal conflict still does not support the degree of social limitation alleged. Rather, it warrants limiting the type of social interaction the claimant would encounter in a job. It is also notable that at the time of the hearing, [<u>Plaintiff</u>] <u>had been working for over a year at Subway, in a position that involved extensive customer interaction</u> ([Tr. 282] and testimony).

(Tr. 41-42 (emphasis added).)

Contrary to Plaintiff's contentions (<u>see</u> Docket Entry 11 at 6), the above-quoted evidence does build a logical bridge between the evidence of record and the ALJ's finding that, notwithstanding greater interaction limitations generally, Plaintiff could interact sufficiently with others to complete a 30-day training period (<u>see</u> Tr. 38). As the language emphasized above makes clear, the ALJ explained the training period carve-out in the RFC by noting that 1) Plaintiff had previously worked longer than 30 days in jobs that required more extensive social interaction, 2) Plaintiff's symptoms remained fairly well managed on limited, conservative treatment during the relevant period,[8] 3) all but two of the jobs Plaintiff

---

[8] The ALJ had earlier in the decision observed that 1) "a gap [existed] in [Plaintiff]'s medical history [from her application date of September 1, 2020,] until late April of 2021" (Tr. 40), 2) on April 30, 2021, Emily Headrick, FNP, "diagnosed [Plaintiff] with dissociative identity disorder, but deemed it stable
(continued...)

12

reported losing due to interpersonal conflict predated the relevant period and all of them involved more extensive interaction than the RFC permits, and 4) at the time of the ALJ's hearing, Plaintiff had worked for over year at Subway, which involved extensive interaction with the public. (See Tr. 41-42.)[9] The ALJ, in explaining the carve-out in the RFC for the 30-day training period, thus pointed to "'such relevant evidence as a reasonable mind might accept as adequate to support [her] conclusion.'" Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Another district court in the Fourth Circuit has addressed a similar training period carve-out and found that the ALJ had provided an adequate explanation:

> The ALJ provided a reasonable explanation for allowing [the p]laintiff more than occasional contact with

---

[8] (...continued) with no imminent safety concerns" (id.), 3) "[Plaintiff] began injectable estrogen treatments on November 16, 2021[,]" and, "[a]fter the second injection, [she] reported stable mood and being hopeful about change in treatment" (Tr. 41), 4)"[i]n April of 2022, [she] expressed interest in gender affirming surgery" and "[h]er depressive symptoms were significantly reduced in severity by self-report" (id.), 5) "[i]n April of 2022, [she] began treatment at Take My Hand Therapy" and "[t]reatment notes describe occasional anxiety and feelings of stress but were notable for [her] reports of work activities" (id.), and 6) "[a]t a December 8, 2022 appointment with Jessica Rubio, FNP, [Plaintiff] was alert and cooperative, with normal mood and affect, and normal attention span and concentration" (id.).

[9] At the hearing on September 16, 2022, Plaintiff testified that she had worked at Subway since August 2021, with the exception of two and half months when she worked at Home Depot before returning to Subway. (See Tr. 68.) She further testified that her job at Subway involved opening and closing the store, cleaning, preparing food, and ringing up customers (see Tr. 68-69), as well as that she worked between 30 and 40 hours per week at that job (see Tr. 86). Additionally, she testified her boss at Subway "treat[ed Plaintiff] pretty fair" and "[wa]s actually one of the most respectful bosses that [Plaintiff had] had," as well as that "the store owner . . . [wa]s one of the nicest store owners [Plaintiff had] ever had." (Tr. 80-81.)

13

supervisors for the brief training period - noting that it is logical that one would have more contact with a supervisor when starting a new job, and that the <u>medical evidence demonstrated largely unremarkable findings, including cooperative and normal behavior</u>. It is apparent that notwithstanding the occasional contact limitation, the VE identified several jobs the [p]laintiff could still perform, knowing that there is a brief thirty-day period for training purposes, because he identified unskilled jobs. In sum, the [court] is not left to speculate how the ALJ included the provision that the [p]laintiff could tolerate more than occasional cont[]act during his training period, allowing for meaningful judicial review.

<u>Jess B. v. Kijakazi</u>, No. 2:23CV7, 2023 WL 6457322, at *9 (S.D.W. Va. Aug. 21, 2023) (unpublished) (emphasis added) (internal quotation marks omitted), <u>recommendation adopted</u>, 2023 WL 6449442 (S.D.W. Va. Oct. 3, 2023) (unpublished).[10]

In fact, many other cases have found training period carve-outs similar to the one at issue here permissible, where the ALJ provided a sufficient explanation supported by substantial evidence. See <u>Bowen v. Commissioner of Soc. Sec.</u>, No. 3:25CV1142,

---

[10] Plaintiff's reliance on <u>Sczepanski</u> misses the mark. (<u>See</u> Docket Entry 11 at 7.) In that case, the VE testified that the jobs at issue required 90-day probationary periods during which employers did not tolerate any absence. <u>See</u> <u>Sczepanski</u>, 946 F.3d at 155. Because the RFC allowed one absence per month, the court found that the ALJ erred by not resolving the conflict between the RFC's absence allowance and the VE's testimony that employers would not tolerate absence for the first 90 days. <u>See id.</u> The instant case involves neither a 90-day probationary period, nor an RFC that allows one absence per month, and, thus, <u>Sczepanski</u> does not aid Plaintiff's cause. <u>See Elizabeth L. F. v. Kijakazi</u>, No. 2:22CV506, 2023 WL 3981441, at *3-4 (D. Utah June 13, 2023) (unpublished) ("[T]he ALJ . . . limited [the p]laintiff to only occasionally interacting with co-workers, supervisors, and the general public. [The p]laintiff alleges it is unclear how she could learn any of the jobs identified by the VE[,] . . . because she could not complete a probationary period of employment without more than occasional contact. In support[, the p]laintiff cites to a case out of the Second Circuit, *Sczepanski* . . . . In *Sczepanski*, the ALJ determined that the RFC included a limitation of being able to miss up to one day of work per month, which specifically called into question whether that claimant could complete a probationary period of employment. There is no such limitation here.").

14

2026 WL 479071, at *22 (N.D. Ohio Feb. 20, 2026) (unpublished) ("[S]ubstantial evidence supported the ALJ's conclusion that [the plaintiff] could perform work with more than occasional interaction with supervisors during an initial training period. . . . This case is distinguishable from . . . [cases] . . . [in which] the ALJ provided no explanation for making a distinction between the claimant's abilities before and after a training period. Here, in contrast, reading the ALJ's decision as a whole and with common sense, the ALJ adequately explained why [the plaintiff] could tolerate more than occasional interaction with supervisors during a brief training period. The ALJ noted that [the plaintiff] had sustained [substantial gainful activity] for a portion of the alleged disability period, and other work in the remaining years. . . . [The court is] convinced that a reasonable mind might accept th[at] evidence as adequate to support the ALJ's conclusion that [the plaintiff] can complete a brief training period — in a job requiring no more than simple, routine tasks and simple work-related decisions, and with no hourly productivity goals — with more than occasional interaction with supervisors." (emphasis added)); Karrissa D. v. Bisignano, No. 24CV2685, 2025 WL 2936876, at *4 (D. Minn. July 21, 2025) (unpublished) ("The ALJ built a clear logical bridge between evidence in the record and his conclusion that [the p]laintiff can have frequent contact with supervisors and co-workers during a training period and occasional

15

contact outside that period. . . . [The ALJ] . . . explain[ed] that [the RFC's training period carveout wa]s consistent with records showing . . . <u>a work history that d[id] not show problems getting along with others during initial work training periods, and current work for Door Dash where she [wa]s required to deliver food to customers without any reported problems interacting with others. . . . It is reasonable for the ALJ to conclude that working as a cashier or customer service representative involves frequent interactions with others, and [the p]laintiff's testimony that she can tolerate such full-time work for several months supports the finding that she can maintain frequent interactions during an initial 30-day training period</u>. It is also reasonable for the ALJ to conclude that [the p]laintiff's work with Door Dash requires some level of interaction with others, even if the level of interaction is less than she experienced as a cashier or customer service representative. . . . Even if another ALJ could have weighed the evidence as [the p]laintiff wishes, her challenges do not demonstrate the ALJ was outside the available zone of choice in formulating this portion of the RFC." (emphasis added) (internal citations and quotation marks omitted)); <u>Reggie N. v. Kijakazi</u>, No. 21CV63, 2023 WL 5277877, at *3-4 (N.D. Ill. Aug. 16, 2023) (unpublished) ("[T]he ALJ found that . . . [the plaintiff] can learn work duties from a supervisor (during introduction of work/probationary period) and thereafter tolerate occasional

16

supervision following the introduction of tasks. . . . [The plaintiff ] complain[s ] that the ALJ did not explain how [the plaintiff] could interact with supervisors on an unlimited basis during the probationary period given his difficulty with social interaction. . . . The ALJ [] pointed to record evidence that despite [the plaintiff's] allegations, [he] had been and could be successful in his interactions[, including] . . . <u>medical records describing [the plaintiff] as pleasant, cooperative, polite, friendly, responsive, and engaged</u> . . . . [The plaintiff] points to no evidence that the ALJ overlooked, and no opinion calls for greater restrictions than the RFC provides. Moreover, [the plaintiff]'s providers rated him at most as moderately inhibited in social interaction. There was no error here." (emphasis added) (internal quotation marks and parenthetical citations omitted)).

Significantly, cases to the contrary do not hold that ALJs cannot carve out interaction limitations for training periods; rather, they merely hold that, under the facts of those cases, the ALJs failed to provide an adequate explanation for the carve-out. <u>See, e.g.</u>, <u>Leitz v. Kijakazi</u>, No. 22-35356, 2023 WL 4342114, at *2 (9th Cir. July 5, 2023) (unpublished) ("In the ALJ's RFC finding, the ALJ held that [the plaintiff] can have brief, superficial interaction with co-workers and the public; and can have occasional interaction with supervisors (although additional time for training is acceptable). [The plaintiff] argues that the parenthetical in

17

the ALJ's assessment of [the plaintiff]'s RFC is a caveat not supported by substantial evidence.  The ALJ did not explain the evidentiary basis for his training-period caveat . . . .  Without an explanation for the training-period caveat, the court is left to speculate as to what evidence, if any, is the basis of the ALJ's reasoning and conclusion." (emphasis added) (internal quotation marks omitted)); Peter T.S. v. Dudek, Civ. No. 22C3984, 2025 WL 964959, at *5-7 (N.D. Ill. Mar. 31, 2025) (unpublished) ("While the RFC distinguishes [the c]laimant's ability to interact with supervisors . . . during an introductory period, . . . there is no evidence identified by the ALJ to support this distinction.  The ALJ does not explain why [the c]laimant would be able to engage with supervisors in a different manner during an introductory period when compared to the limitations on [the c]laimant's ability to engage with supervisors otherwise while working, as well as more broadly with respect to coworkers and the public.  The ALJ simply asserts this as fact with nothing in the record to support it other than her say-so. . . .  It is certainly possible that, where properly supported, an RFC could draw a distinction between a claimant's abilities during an introductory, probationary, or training period, and the claimant's abilities to perform job requirements on a regular and ongoing basis." (emphasis added)); Clarissa W.-J. v. O'Malley, No. 23CV729, 2024 WL 3541932, at *20 (D. Minn. July 10, 2024) (unpublished) ("[T]he ALJ did not

18

articulate any reason for the distinction in [the p]laintiff's capacity to interact during a 30-day training period and outside of that period. There may well be reasons why [the p]laintiff could have the capacity to interact sufficiently to complete a 30-day training period, but the [c]ourt cannot engage in post hoc rationalizations to support that conclusion." (emphasis added) (internal quotation marks omitted)), recommendation adopted, 2024 WL 3540855 (D. Minn. July 25, 2024) (unpublished); Clampit v. Commissioner of Soc. Sec., No. 3:22CV1561, 2023 WL 2958158, at *6 (N.D. Ohio Mar. 30, 2023) (unpublished) ("[O]ther courts have reversed where, as here, the ALJ does not provide an explanation for making a distinction in abilities before and after a training period. Nothing forbids the ALJ from making a distinction before and after a training period. However, the ALJ's opinion must permit th[e] reviewing court to follow [his] reasoning . . . . Because the ALJ failed to explain his reasoning or the evidence supporting his decision to make a distinction between [the plaintiff]'s abilities before and after a training period, remand is appropriate." (collecting cases) (emphasis added) (internal citations and quotation marks omitted)), recommendation adopted, 2023 WL 2956613 (N.D. Ohio Apr. 14, 2023) (unpublished); Slate v. Kijakazi, No. 3:21CV298, 2022 WL 1046290, at *6 (D. Nev. Apr. 6, 2022) (unpublished) ("[The] ALJ . . . did not explain why he credited [the consultative psychological examiner's] opinion

19

that [the p]laintiff could have only occasional interaction with coworkers and supervisors and no interaction with the public, but found [the p]laintiff was capable of frequent interaction with supervisors and coworkers for up to a month during the training or orientation period.  The court finds [the] ALJ [] erred in failing to address this conflict, and remand is appropriate on this basis." (emphasis added)).

Plaintiff additionally contends that "[t]he RFC, and the entirety of the [ALJ's] decision, is silent as to what level of interaction [] Plaintiff might engage in with coworkers and supervisors during her probationary period[,] . . . thereby leaving the Court to perform guesswork in figuring out what the ALJ intended."  (Docket Entry 11 at 8 (emphasis in original).)  In that regard, Plaintiff notes that "the [VE] was not asked whether Plaintiff . . . could complete a training period" (id. at 11), and that "[n]o testimony addressed whether the [s]tep [f]ive jobs cited by the ALJ require a probationary or onboarding phase involving more intense social functioning" (id. at 12).

As an initial matter, to the extent Plaintiff challenges the sufficiency of the VE's testimony to support the ALJ's step five finding that jobs existed in significant numbers in the national economy that Plaintiff could perform, Plaintiff has forfeited such a challenge in this Court.  The ALJ's dispositive hypothetical question to the VE included that "[t]he individual is limited to

20

work in which she could work in proximity to but not coordination with coworkers and supervisors" and that "the individual would still be able to interact with other sufficiently to complete a 30 day training period for any such occupation" (Tr. 92 (emphasis added)), and the VE responded that three light-exertion jobs (marker, routing clerk, and inspector/hand packager) and three medium-exertion jobs (order picker, laundry worker II, and industrial cleaner) accommodated those interaction limitations (see Tr. 92-93).[11] Plaintiff's hearing-level attorney subsequently cross-examined the VE, but did not ask the VE 1) whether the jobs she cited required a training period, 2) how long a training period for each of those jobs would last, 3) how much interaction with others a training period would require. (See Tr. 96-97.)

Under such circumstances, Plaintiff has forfeited her challenge to the VE's testimony. See Wyrock v. Commissioner of Soc. Sec. Admin., No. 1:19CV1052, 2020 WL 1322846, at *3 (N.D. Ohio Mar. 20, 2020) (unpublished) ("[The plaintiff] had an ability to cross-examine [the] VE [] at the hearing, did cross-examine him at the hearing, and failed to question him about [the plaintiff]'s ability to complete a 30-day training period for the jobs [the VE] identified. Thus, [the plaintiff] has waived or forfeited this issue."); Bunton v. Colvin, No. 1:10CV786, 2014 WL 639618, at *5

---

[11] The ALJ ultimately found, at step five of the SEP, that Plaintiff could perform two of the VE's cited light jobs (marker and routing clerk) and one of the medium jobs (industrial cleaner). (See Tr. 45.)

21

(M.D.N.C. Feb. 18, 2014) (unpublished) (finding waiver of issue on judicial review where the plaintiff "failed to mount any opposition . . . to the view that he retained the capacity to do the [jobs proffered by the VE], despite . . . the opportunity . . . to question the VE about . . . those positions"), recommendation adopted, slip op. (M.D.N.C. Mar. 10, 2014) (Schroeder, J).

Moreover, even if Plaintiff has not forfeited her challenge to the VE's testimony, the absence of VE testimony regarding whether the jobs in question require training periods and, if so, the expected duration and level of interaction of such periods, does not render the VE's testimony insufficient to support the ALJ's step five finding. The Dictionary of Occupational Titles ("DOT") categorizes all three jobs adopted by the ALJ at step five as having a Specific Vocational Preparation ("SVP") of 2, see DOT, No. 209.587-034 ("Marker"), 1991 WL 671802 (G.P.O. 4th ed. 1991); DOT, No. 222.587-038 ("Router"), 1991 WL 672123; DOT, No. 381.687-018 ("Cleaner, Industrial"), 1991 WL 673258, meaning that a worker can learn the jobs through "anything beyond [a] short demonstration up to and including 1 month," DOT, App'x C ("Components of the Definition Trailer"), § II ("Specific Vocational Preparation (SVP)"), 1991 WL 688702; see also 20 C.F.R. § 416.968(a) (explaining that "unskilled" work involves "little or no judgment to do simple duties that can be learned on the job in a short period of time"). Furthermore, the DOT rates the task of "[t]aking

22

[i]nstructions" for all three jobs adopted by the ALJ as "[n]ot [s]ignificant."  DOT, No. 209.587-034 ("Marker"), 1991 WL 671802; DOT, No. 222.587-038 ("Router"), 1991 WL 672123; DOT, No. 381.687-018 ("Cleaner, Industrial"), 1991 WL 673258.

Under such circumstances, the Court can meaningfully interpret the ALJ's training period carve-out as a finding that, notwithstanding greater interaction limitations on a regular and continuing basis, Plaintiff could tolerate the levels of interaction required by any brief period of training to learn an SVP 2 job that also entails "simple instructions," "simple work-related decisions," and "a low stress setting," defined to mean "no paced production requirements," "occasional changes in the work setting or routine, and no dealing with crisis situations as an essential function of the job" (Tr. 38).  See Reggie N., 2023 WL 5277877, at *3-4  ("[T]he supervision the RFC['s training period carve-out] contemplates is inherently limited, as is the work itself.  Indeed, the RFC restricts [the plaintiff] to simple instructions and tasks and no over-the-shoulder or intense supervision, teamwork, or fast-paced production, among other restrictions.  It requires no leap of logic to deduce that the associated teaching and learning curves are not grueling — a conclusion bolstered by the unskilled nature and [SVP 2] score for the jobs identified as suitable for [the plaintiff]." (emphasis added) (internal parenthetical citations omitted)); Vargas v. Saul,

23

No. 1:19CV1858, 2020 WL 2468401, at *4, 9 (M.D. Pa. May 13, 2020) (unpublished) ("Th[e VE's] testimony[ that three SVP 2 jobs could accommodate an RFC limiting the plaintiff to occasional interaction with others] was entirely consistent with the [DOT's] definitions for th[o]se jobs, . . . whose training requirements are minimal and consist of anything beyond [a] short demonstration up to and including 1 month.  These positions also only entailed Level 1 or 2 reasoning skills and merely required the worker to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions, or apply commonsense understanding to carry out simple one-or two-step instructions.  Moreover, according to the [DOT,] taking instructions was not deemed a significant part of the job functions of any of these jobs.  In light of these facts, . . . it cannot be said that the mere possibility that initial training for these jobs might involve more than occasional contact in the first weeks on the job wholly undermined the ALJ's decision in a material way which compels a remand of this case." (emphasis added) (internal citations, quotation marks, and brackets omitted)).[12]

_____

[12] Significantly, other courts have affirmed training period carve-outs in RFCs even where (A) those carve-outs did not specify the length of the training period or the degree of interaction allowed during the training period, see, e.g., Bowen, 2026 WL 479071, at *13, *22 (where ALJ found that, "[a]fter an initial training period, [the plaintiff] can tolerate only occasional interaction with supervisors," the court found that, "reading the ALJ's decision as a whole and with common sense, the ALJ adequately explained why [the plaintiff] could tolerate more than occasional interaction with supervisors during a brief training period"); Mario G. v. O'Malley, No. 21CV472, 2024 WL 916234, at *7 (N.D. Ill. Mar. 4, 2024) (unpublished) ("[The plaintiff] argu[es ] that [the ALJ] erred
(continued...)

24

Next, Plaintiff maintains that "[n]ot one of the[ medical] opinions [of record] endorses or suggests that Plaintiff's limitations relating to social contact would be less pronounced during a given period of employment." (Docket Entry 11 at 10.) In that regard, Plaintiff points out that the state agency psychological consultants both "assessed Plaintiff as 'moderately limited' in the ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers" (id. at 9 (quoting Tr. 107, 118)) and opined that Plaintiff "'would perform best in a reduced social setting'" (id. (quoting Tr. 108, 118)). In addition, Plaintiff notes that LPA Phelps "opined that Plaintiff may have 'mild difficulty interacting

_____

¹² (...continued)
in concluding that . . . [the plaintiff] could withstand interaction with a supervisor during a training period, while still limiting him to occasional interaction with co-workers, supervisors, and the public thereafter. . . . [C]ourts in this district have upheld RFCs allowing for unlimited or typical levels of interaction during an introductory period and only occasional work-related interactions thereafter. As such, the fact that the RFC did not include any restrictions on interaction during the training period was neither improper nor unusual, and there can be no remand on this basis." (emphasis added) (internal citations and quotation marks omitted)), and (B) where the VE did not provide testimony regarding the length or level of interaction of any required training periods, see Littlejohn v. Kijakazi, Civ. No. 22-4678, 2023 WL 4564548, at *4 (E.D. Pa. July 17, 2023) (unpublished) ("The ALJ . . . could not know exactly how long the training period would be for a specific job, or what level of contact it would involve. However, the training requirements for unskilled work can require anything beyond a short demonstration up to and including 1 month. For this reason, [the] ALJ[] assumed that a 30-day training period was a possibility. What is meaningful is that [the] ALJ . . . concluded that, even if 30 days of training was required, this would not undermine [the plaintiff]'s ability to perform the job, provided that the job was limited to only occasional interaction with a supervisor after the initial training period. The [court] is persuaded that the approach taken by [cases finding no conflict between a limitation to occasional interaction and a brief training period that could require more interaction] is realistic, in the absence of any specific evidence that a claimant could not complete a 30-day training period." (internal citations and quotation marks omitted)).

25

appropriately with peers and coworkers and responding appropriately to supervision'" (id. at 10 (quoting Tr. 627)), and that LPA Westfall predicted "'significant difficulties interacting with peers and coworkers and responding appropriately to supervision'" (id. (quoting Tr. 651)). According to Plaintiff, "[t]he ALJ identifies no [] medical opinion to support the temporary lift of Plaintiff's social restrictions and, in fact, *rejects* portions of the [s]tate agency psychological consultants' opinions in favor of the ALJ's own opinion as to [] Plaintiff's mental limitations." (Id. (citing Tr. 42) (emphasis in original).) Plaintiff thus posits that "it is improper for [the] ALJ to render an opinion as to [Plaintiff]'s functional limitations without the assistance of and citation to a medical opinion." (Id. at 10-11.)

Plaintiff's argument fails, because "the ALJ labored under no obligation to fashion an RFC that exactly matched . . . the opinion evidence," Gilmore v. Kijakazi, No. 1:21CV420, 2022 WL 2869407, at *8 (M.D.N.C. July 21, 2022) (unpublished), recommendation adopted, 2022 WL 3446133 (M.D.N.C. Aug. 17, 2022) (unpublished) (Biggs, J.). The United States Court of Appeals for the Fourth Circuit has long recognized that the RFC assessment constitutes an administrative finding rather than a medical finding, see Felton-Miller v. Astrue, 459 F. App'x 226, 230-21 (4th Cir. 2011) (deeming RFC "an administrative assessment made by the Commissioner based on all the relevant evidence in the case record"), and, thus, "[t]he

26

determination of an individual's RFC need not be based on a medical opinion," <u>Town v. Astrue</u>, No 3:12CV105, 2012 WL 6150836, at *4 (N.D. Ind. Dec. 10, 2012) (unpublished)). "Instead, an ALJ must consider all relevant evidence in the record, including the opinions of medical sources, and arrive at a determination of a claimant's RFC that is supported by substantial evidence." <u>Fruit v. Colvin</u>, No. 2:14CV7643, 2015 WL 1021309, at *22 (S.D.W. Va. Mar. 9, 2015) (unpublished).

Here, the ALJ found the opinions of the state agency psychological consultants that Plaintiff could perform work "in a reduced social setting . . . partly persuasive" (Tr. 42 (referencing Tr. 108, 118)), but noted that "[Plaintiff]'s mental functional limitations [we]re better expressed as set forth in the [RFC]" (<u>id.</u>). Thus, contrary to Plaintiff's argument (<u>see</u> Docket Entry 11 at 10), the ALJ did not <u>reject</u> the consultants' interaction opinions; rather, the ALJ found that the RFC, which contained much more specific interaction limitations than a "reduced social setting" (<u>compare</u> Tr. 38, <u>with</u> Tr. 108, 118), "better expressed" Plaintiff's social limitations (Tr. 42).

With regard to the consultative psychological examiners, the ALJ found LPA Phelps's opinion overall "only partly persuasive" (Tr. 42), and her opinion that Plaintiff "'may have difficulty' . . . interacting with peers, co-workers and supervisors [] vague and speculative, and based on a one-time exam"

27

(Tr. 43 (quoting Tr. 618)).  The ALJ further noted that, "[t]o the extent [Plaintiff] has some difficulties in . . . interacting with peers, co-workers, and supervisors, those difficulties have been taken into account in assessing [Plaintiff's RFC], which limits . . . the nature of social interaction [she] would be expected to be able to tolerate."  (Id.)  The ALJ next found LPA Westfall's opinions overall "not fully persuasive," noting that "the report at times gets [Plaintiff]'s first and last names wrong, which suggest[s] the report was not carefully reviewed or edited." (Id. (citing Tr. 645, 650-51).)  The ALJ further found that "speculation as to the likelihood of difficulties . . . in interacting with peers, coworkers, and supervisors are [sic] based largely on [Plaintiff]'s subjective reports and findings on the one-time examination, and are not otherwise well supported."  (Id.) The ALJ noted in particular "that observations of [Plaintiff]'s primary care and mental health providers in the visits before and after this exam did not reflect findings or observations consistent with those of [LPA] Westfall."  (Id. (citing Tr. 655-58, 771-86).) Thus, as to those two competing interaction opinions, i.e., "mild" (Tr. 618) versus "significant" (Tr. 651) difficulties in interaction, "the ALJ's decision reveals that she found neither . . . fully persuasive and instead struck a balance between those two opposing viewpoints," Gilmore, 2022 WL 2869047, at *8, and found Plaintiff could tolerate interaction during a brief,

28

initial training period and superficial interaction with others thereafter (see Tr. 38).  Accordingly, far from "'substituting her lay opinion'" for that medical opinion evidence (Docket Entry 11 at 11 (quoting Brown v. Colvin, No. 3:14CV4237, 2015 WL 6501547, at *9 (N.D. Tex. Oct. 27, 2015) (unpublished))), the ALJ's evaluation of the mental opinion evidence provides further support for the ALJ's determination that Plaintiff could "interact sufficiently to complete a 30 day training period" (Tr. 38).

Put simply, Plaintiff's first and only issue on review fails as a matter of law.

### III.  CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED,** and that this action is **DISMISSED** with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

March 16, 2026